UNITED STATES COURT OF INTERNATIONAL TRADE

EMERA ENERGY SERVICES, INC.,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant.

Court No.: 18-cv-00074

# COMPLAINT

Plaintiff, Emera Energy Services, Inc. ("Emera"), by and through its undersigned attorney, brings this action and states and alleges as follows:

## BRIEF DESCRIPTION OF ACTION

1. Emera brings this action to contest the deemed denial by U.S. Customs and Border Protection ("CBP") of its timely filed protest, Protest Number 0704-17-100004, challenging the denial by CBP of the exemption from Merchandise Processing Fees ("MPF") for Canadian-origin goods pursuant to the terms of the North American Free Trade Agreement ("NAFTA") and CBP's assessment of its MPF of up to U.S. $400 per day and up to U.S. $12,400 per month to cover the cost of processing one electronically-filed monthly entry summary.

## JURISDICTION

2. This action arises from CBP's denial, pursuant to Section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1515, of Emera's protest submitted pursuant to 19 U.S.C. § 1514(a)(1)(2) (hereinafter "the Protest").

3. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).

4. Emera has paid all liquidated duties, taxes, and charges prior to commencing this action.

5. Emera exhausted all administrative remedies available to it prior to commending this action.

6. Emera timely filed the Protest at issue on August 4, 2017.

## STANDING

7. Emera is the importer of record of the merchandise which is the subject of this action.

## PARTIES

8. Emera is a U.S. corporation, incorporated in Delaware, with its principal place of business located at Suite 101, #37, Route 236, Kittery, Maine 03904. Emera is in the business, *inter alia*, of purchasing natural gas from Canada that arrives in the United States via various pipelines that run between Canada and the United States.

9. Emera's Importer of Record Number is 60-000272100.

## FACTUAL AND PROCEDURAL BACKGROUND

10. Emera has been in the business, *inter alia*, of marketing and trading wholesale natural gas in the United States for approximately sixteen (16) years. Emera is a subsidiary of Emera Incorporated, an energy company with over 4,000 employees in the United States with operations in six (6) states.

11. In conducting its business, Emera transports natural gas exclusively via interstate pipelines owned and operated by third parties. Emera purchases (or "nominates" as the term is used in the industry) natural gas daily on thirty (30) different pipelines, including all major interstate pipelines in the Northeast United States and is knowledgeable about natural gas flows in those pipelines.

2

12. For all transactions at issue in this matter, Emera Energy Inc. ("Emera Canada"), an affiliate of Emera, procured gas on pipelines in Canada and any natural gas imported into the United States by Emera is sold to Emera by Emera Canada.

13. Since 1970, natural gas entering the United States via pipeline has been exempt from daily entry filing requirements. Importers are permitted to file a consolidated entry summary evidencing the daily volumes of natural gas entered into the United States by the importer during the previous month. One (1) monthly entry summary is required for each port of entry. This program, although classified as "temporary" by CBP, was initiated in 1970 pursuant to a Circular issued by CBP on July 1, 1970, nearly forty-eight (48) years ago.

14. Natural gas is classified under HTSUS at 2711.2.0000 and is consequently a duty-free item. As with any other merchandise entered into the customs territory of the United States, it is subject to MPF charges.

15. However, qualifying natural gas imported from Mexico and Canada into the United States is exempt from the MPF pursuant to the terms of NAFTA, 19 U.S.C. § 58c(b)(10)(B), and 19 C.F.R. § 23.23(c)(3).

16. In order to claim the NAFTA exemption from MPF, importers are required to make a formal declaration on their monthly entry summaries that the natural gas qualifies as an originating good, and to obtain and produce a NAFTA Certificate of Origin that certifies the basis for the claimed exemption. With regard to the entries covered by the matter, Emera claimed preferential treatment and obtained Certificates of Origin, as set out in greater detail below, from Emera Canada.

17. Although only a singly monthly entry summary is filed and processed by CBP, non-originating (non-NAFTA certified) natural gas entries are subject to MPF assessment on the

3

1-1529665.2

basis of daily volumes as the lesser of (a) $400 per day or (b) the *ad valorem* rate of 0.3464%, ostensibly pursuant to CBP's interpretation of 19 C.F.R. § 24.23(d). Consequently importers can be assessed up to a U.S. $12,400 MPF charge per month per port of entry to cover the cost of processing one (1) single, electronically-filed consolidated entry summary.

18.  The entries that are the subject of this Complaint cover imports made by Emera at the interconnection between the Canadian mainline pipeline owned and operated by TransCanada PipeLines Ltd. (hereinafter "TransCanada") and the Iroquois Gas Transmission System (hereinafter "Iroquois") interstate pipeline near Waddington, New York.

19.  During the months covered by the entries, Emera imported natural gas into the Iroquois pipeline at the Waddington border point. One hundred percent (100%) of the natural gas at issue was acquired by Emera from Emera Canada and its claimed NAFTA status was supported by the NAFTA Certificates of Origin issued or in the possession of Emera Canada.

20.  Emera Canada acquired this natural gas through two (2) primary sources of supply: (a) by purchasing natural gas on the Natural Gas Exchange (hereinafter "NGX"); and (b) directly from third parties, including imports into Canada from Emera.

21.  When Emera Canada purchases gas that will be imported into the United States and resold to Emera it obtains NAFTA Certificates or Origin directly from those third parties, including from Emera.

22.  When Emera purchased gas from NGX, it understood that because NGX served as a neutral intermediary and not a direct seller, it did not issue NAFTA Certificates of Origin for gas it sold on the NGX.

4

23. However, all natural gas sold to NGX is subject to the representations and warranties contained in NGX's Contracting Party Agreement terms and conditions. In pertinent part those terms provides the following warranty:

> NAFTA: The contracting party, when entering into a Physically Settled Futures Transaction of Forward Transaction as Seller, represents and warrants that natural gas or oil delivered, or to be delivered, from or at a Canadian Delivery Point, shall be wholly obtained or produced in North America and qualifies as an originating good pursuant to Annex 401 of the North American Free Trade Agreement.

24. Based upon that representation and based upon its extensive knowledge of the pipeline gas origin and gas-flows, Emera Canada issued its own NAFTA Certificate of Origin for gas it purchased on the NGX and sold to Emera.

25. CBP regulations provide that a party, such as Emera Canada may, in good faith, complete a NAFTA Certificate of Origin on the basis of:

   (1) Its knowledge of whether the good qualifies as an originating good;
   (2) Its reasonable reliance on the producer's written representation that the good qualifies as an originating good; or
   (3) A completed and signed Certificate for the good voluntarily provided to the exporter by the producer.

19 C.F.R. § 181.11(b)(1)(2)(3).

26. In compliance with 19 C.F.R. § 181.1, Emera Canada bases the issuance of its NAFTA Certificates upon: (a) the written representations contained in the NGX Contracting party Agreement; and (b) Emera Canada's extensive knowledge of the physical and operational configuration of natural gas production and pipeline supply chain.

27. As a result, Emera has for years filed monthly entry summaries at the Port of Champlain (and other ports of entry) and relied on the NAFTA Certificates of Origin issued by third-party sellers and Emera Canada in claiming exemption from the MPF charges.

J-1529665.2

28. As the following timeline indicates, Emera and CBP have been dealing with each other on MPF issues for close to five (5) years.

29. By Notice dated May 6, 2013, Emera received a NAFTA Verification of Origin Questionnaire seeking information in connection with natural gas entries into the Calais, Maine port of entry.

30. By Notice dated July 15, 2013, CBP, subsequent to its review of Emera's responses to its Questionnaire, determined "that the natural gas qualifies as originating under the terms of the North American Free Trade Agreement."

31. On April 13, 2015, CBP issued a Request for Information ("RFI") from Emera seeking verification of the originating states of natural gas transiting into the United States through Champlain pursuant to Article 506 of NAFTA.

32. By letter dated May 29, 2015, Emera responded to the RFI and submitted: (a) Emera Canada's Blanket NAFTA Certificate of Origin; ( b) Emera's Blanket NAFTA Certificate of Origin; (c) Relevant party agreements and terms issued by NGX; and (d) pertinent third party blanket NAFTA Certificates of Origin.

33. Emera's written response set out a series of operational and contractual factors that provided a detailed overview of how natural gas transits the extensive North American Pipeline system, specifically indicating how those operational characteristics provides Emera with knowledge as to the NAFTA eligibility of natural gas that moves via Iroquois pipeline at Champlain.

34. On June 23, 2015, in response, CBP issued a Proposed Notice of Action to Emera that advised that CBP was proposing to deny Emera's preferential treatment claims. CBP's

I-1529665.2

June 23, 2015 letter requested that Emera "provide evidence of where the natural gas was extracted from the ground."

35. On July 13, 2015, in its response, Emera submitted, *inter alia*, the following documents: (a) natural gas pipeline transmission maps; and (b) relevant Canadian gas production tables.

36. In its written response, Emera provided detailed specific reasons why the natural gas in question was NAFTA-originating. It acknowledged that it could not identify the well-point of any of the trillions of molecules of gas that transit pipelines in Canada or the United States. Emera pointed out, however, that it was not required under 19 C.F.R. § 181.11 to identify a specific point of extraction in order to successfully claim NAFTA status, and that it could find nothing in the NAFTA or CBP regulation that contained such a requirement. In its response, Emera requested a meeting with CBP in Champlain in order to explain and support its position.

37. Subsequently, CBP agreed to meet with Emera in Champlain. That meeting was held at CBP's offices in Champlain on August 19, 2015. CBP personnel from its Energy Center of Excellence in Houston, Texas, participated in the meeting via teleconference.

38. At that August 19, 2015 meeting, Emera provided a two (2) hour presentation and explained the operational characteristics of the North American natural gas industry and its pipelines.

39. At that meeting, Emera also pointed out that any *de minimis* quantities of foreign Liquefied Natural Gas ("LNG") injected into coastal pipelines from vessels at port in the United States and/or Canada could not, owing to geographic and operational reasons, be imported into the United State via Champlain.

40. At the conclusion of its presentation, Emera noted that the verification issues it faced with CBP implicated not just Emera but every cross-border natural gas supplier or importer. Emera suggested a stakeholder forum that could discuss an industry-wide approach to NAFTA treatment of natural gas rather than a piecemeal approach targeting an assortment of importers.

41. Over one (1) year after the August 19, 2015 meeting, by letter dated September 26, 2016, CBP issued a further Proposed Notice of Action to Emera. By that letter, CBP again denied Emera's ongoing assertions that the natural gas in question was exempt from MPF based, in part, upon CBP's ongoing refusal to accept Emera's NAFTA Certificate of Origin that had been based on both Emera's knowledge and experience with the pipeline system and the representations and warranties contained in the NGX Terms and Conditions.

42. In its September 26, 2016 Proposed Notice, CBP again asserted that it required a "bill of materials, cost data, production records, manufacturing records, and gauger reports" and "evidence of where the natural gas is extracted from the ground."

43. By letter dated October 25, 2016, Emera submitted its response. In its response Emera again asserted that there was no statutory or treaty requirements for the information that CBP was seeking, whether within the requirements contained in § 181.11(b)(1)(2)(3) or otherwise.

44. Emera's response explained again that pipeline natural gas is a totally fungible product that, unlike tires, batteries, or cars, etc., cannot be traced to a specific factory or facility. In fact, CBP's position effectively excludes all natural gas from the benefits of NAFTA because no molecule of gas, once injected into a pipeline and mixed with every other molecule in the system, can be traced with any degree of certainty.

8

45. Nonetheless, Emera asserted and continues to assert that this intermingling of a fungible product does not in any way negate the fact that the gas in the pipeline is NAFTA originating.

46. CBP issued a Final Notice of Action on January 19, 20017, again denying NAFTA qualifying treatment to the entries that are the subject of this Complaint.

47. The entries were liquidated on February 20, 2017, and advance notices were issued assessing MPF plus interest. Those invoices have been paid.

48. Emera timely filed its Protest on August 4, 2017.

49. The Protest was denied on March 13, 2018.

50. In its Protest, Emera repeated the arguments set out above.

51. Emera also protested CBP's liquidation on the grounds that the MPF of up to $400 per day and up to $12,400 per month, as applied to allegedly non-NAFTA qualified natural gas was an impermissible tax that grossly exceeds the cost of processing electronically filed monthly entry summaries. Emera made the following assertions in support of its protest:

52. As set out above, since 1970, gas entering the United States from Canada has been exempt from a daily filing requirement. Instead, for the last forty-eight (48) years, importers of natural gas have been exempt from a daily filing requirement and have been able to file a consolidated monthly entry summary for gas moving to one importer at one point of entry.

53. MPF, when imposed on traditional entries, is assessed at an *ad valorem* rate of 0.3464% subject to a maximum fee of $485 per entry. 19 C.F.R. § 24.23(b)(1).

54. CBP charges non-NAFTA eligible gas at a modified rate. Specifically, it charges importers 0.3464% of the value of each day's volume, with a maximum MPF fee of $400 per day.

9

55. Given the high volume of natural has crossing the border, large-volume importers such as Emera are liable to pay the maximum daily rate per day per port.

56. As set out by the Supreme Court, user fees such as the MPF are valid as such so long as they "(1) do not discriminate against interstate commerce, (2) are based upon some fair approximation of use, and (3) are not shown to be excessive in relation to the cost to the government of the benefits provided." *Massachusetts v. United States*, 433 U.S. 444, 464 (1978).

57. Ostensibly, the MPF assessment of up to $400 per day is based upon CBP's interpretation of a legislative amendment to the United States Customs laws. *See* Section 111(f) of Pub. L 101-382, as amended by Pub. L. 101-508, Title X, § 100001(c), Nov. 5, 1990, 104 Stat.1388-386. *See also* 19 C.F.R. § 24.23(d).

58. The regulations provide as follows:

> (d) Aggregation of *ad valorem* fee.
> (1) Notwithstanding any other provision of this section, in the case of entries of merchandise made under any **temporary** monthly entry program established by CBP before July 1, 1989, **for the purpose of testing entry processing improvements**, the *ad valorem* fee charged under paragraph (b)(1)(i) of this section for each day's importations at an individual port will be the lesser of the following, provided that those importations involve the same importer and exporter:
> (i) $400; or
> (ii) The amount determined by applying the *ad valorem* rate under paragraph (b)(1)(i)(A) of this section to the total value of such daily importations.
> (2) The fees as determined under paragraph (d)(1) of this section must be paid to CBP at the time of presentation of the monthly entry summary. Interest will accrue on the fees paid monthly in accordance with section 6621 of the Internal Revenue Code of 1986.

19 C.F.R. § 24.23(d). [emphasis added]

59. In order for the above-noted provisions to be applicable, the monthly entry program would have be both "temporary" and be used for the purpose of "testing entry processing improvements." As currently utilized it is neither.

60. In response to an earlier Protest, brought by a different importer in 2007, challenging CBP's assessment of $400 per day, CBP, in denying the Protest, asserted that the word "temporary" in the Act and regulations was a descriptive and not a controlling term. *See* HQ W231489 dated May 19, 2008. Emera asserts that the word "temporary" to describe a program that has existed for forty-eight (48) years and can exist for an indefinite period of time deprives the word "temporary" of any meaning, descriptive, controlling or otherwise.

61. It is a canon of statutory construction that courts avoid interpretation of statutes that would render any of their words superfluous. Emera went on to note in its Protest that a "statute should be construed so that effect is given to all its provisions, so that no part be inoperative or superfluous, void, or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

62. Emera concluded in its response that in HQ W231489, CBP rendered the word "temporary" meaningless to the extent it argues that a temporary program can be of infinite duration.

63. Emera further asserts that the monthly entry program has not remained in place for forty-eight (48) years, essentially unchanged, for the "purposes of testing entry processing improvements."

## **COUNT ONE**

64. Plaintiff Emera hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 64 of the Complaint.

65. CBP's denial of Protest 0704-17-100004 was erroneous.

11
I-1529665.2

66. CBP wrongfully denied Plaintiff's Protest at the Port of Champlain that the merchandise at issue was an originating product of a NAFTA country entitled to exemption from MPF pursuant to the NAFTA.

## COUNT TWO

67. Plaintiff Emera hereby repeats, re-alleges, and incorporates by reference paragraphs 1 through 67 of the Complaint.

68. CBP's denial of Protest 0704-17-100004 was erroneous.

69. CBP cannot rightfully claim that the forty-eight (48) year old consolidated monthly entry summary program is "temporary."

70. CBP cannot rightfully claim that the forty-eight (48) year old consolidated monthly entry program is in place for "purposes of testing entry processing improvements."

71. CBP assessment of MPF at the rate of $400 per day and up to $12,400 per month is therefore unlawful, arbitrary, and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Emera respectfully requests that this Court render judgment in its favor and sustain its Protest, by holding the following:

A. that the imported merchandise is a wholly originating product of a NAFTA country and is exempt from assessment of the MPF pursuant to the NAFTA;

B. that Defendant refund those amounts of MPF assessed and collected by Customs at time of liquidation, together with interest as provided by law;

C. that the MPF as currently assessed for non-originating natural gas is unlawful; and

D. that the Court grant any other relief which this Court may deem just and appropriate.

Dated: April 9, 2018

I-1529665.2

Respectfully submitted,

WILLCOX SAVAGE, P.C.
Attorneys for Plaintiff


/s/Leonard L. Fleisig
Leonard L. Fleisig
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
757-628-5605
lfleisig@wilsav.com

1-1529665.2